RPD:DMJ
F. #2003R00380

**SUBMITTED UNDER SEAL**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

04-1101M

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

RICHARD GUADAGNO, also known as "Rich Dano" and "Rich D'Amato,"
SIDNEY SILVER,
RONALD DENT,
AIMEE PEREIRA,
THOMAS RE,
THOMAS LIGOR,
CHARLES RIZZO, also known as "Charlie Walker,"
LEONARD GELLER,
WILLIAM HOBERG,
RICHARD GUADAGNO, JR.,
HOWARD KELLY,
ANTHONY HALL,
JOSEPH MCDONALD,
MICHAEL BRETT and
SETH LEHRENBAUM, also known as "Jim Peterson" and "Seth Peterman,"

Defendants.

AFFIDAVIT AND COMPLAINT IN SUPPORT OF ARREST WARRANTS

(T. 18, U.S.C., 371)

- - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

GAVIN P. SHEA, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

Upon information and belief, in or about and between March 6, 2000 and December 2002, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere, the defendants RICHARD GUADAGNO, also known as "Rich Dano" and "Rich D'Amato," SIDNEY SILVER, RONALD DENT, AIMEE PEREIRA, THOMAS RE, THOMAS LIGOR, CHARLES RIZZO, also known as "Charlie Walker," LEONARD GELLER, WILLIAM HOBERG, RICHARD GUADAGNO, JR., HOWARD KELLY, ANTHONY HALL, JOSEPH MCDONALD, MICHAEL BRETT and SETH LEHRENBAUM, also known as "Jim Peterson" and "Seth Peterman," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to obtain money by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice to defraud, to place and cause to be placed for delivery by the United States Postal Service according to the directions thereon, mail matter, in violation of Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 371).

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the FBI for approximately nine years, during which time I have participated in many investigations of violations of federal laws pertaining to fraud. I have participated in a joint investigation with the United States Postal Inspection Service ("USPIS") of fraud related to the sale of vending machines. The statements

contained herein are based on information obtained from interviews with victims, witnesses, confidential sources and my own review of recorded conversations and financial and other documents obtained during the course of the investigation. I have also received and/or reviewed information obtained by inspectors of the USPIS and discussed information pertaining to the investigation with other law enforcement agents. In addition, I have received information from representatives of the Federal Trade Commission (the "FTC") which, in June 2002, conducted a search of the offices of the entities discussed below based on numerous customer complaints about the activities and business practices of the defendants named herein.

During the time period relevant to this Complaint:

2. Castle Marketing, Inc. ("Castle"), Essex Marketing Group, Inc. ("Essex"), Westbrook Marketing Group, Inc. ("Westbrook"), Westbrook Marketing Associates, LLC, Manhattan Vending, LLC. ("Manhattan Vending") and USA Vending, Inc. ("USA Vending") (all collectively referred to hereinafter as "MHV") were corporations with offices located at 82 Broadway, Greenlawn, New York, 12 Gates Street, Greenlawn, New York and 260 Adams Boulevard, East Farmingdale, New York. In or about and between March 6, 2000 and December 2002, MHV offered for purchase various types of vending machines and routes to customers throughout the United States. The vending machines sold food items such as

chips and beverages and some non-food items such as non-prescription pain relievers. Customers interested in purchasing vending machines and routes called toll-free telephone numbers listed in the advertisements and spoke to salespersons who worked in MHV's corporate offices. The advertisements represented that established vending machine routes were available for purchase for a limited period of time.

<u>The Defendants</u>

3. The defendant RICHARD GUADAGNO, also known as "Rich Dano" and "Rich D'Amato" ("GUADAGNO"), was the president, owner, and/or principal of the MHV entities. The defendant GUADAGNO controlled the day-to-day operations of the MHV entities including, but not limited to, ordering advertisements, management of the financial affairs of all of the entities including banking, receiving payment from customers, paying for vending machines and products to be delivered to customers, disbursement of payroll and commissions and the hiring and firing of employees. The defendant GUADAGNO monitored the activities of salespersons and other employees and ordered and tracked delivery of vending machines and products for the vending machines.

4. The defendant SIDNEY SILVER ("SILVER") was a salesperson at Castle and later became a principal of Castle and a nominee owner of USA Vending. The defendant SILVER had limited authority to hire and fire employees at USA Vending and

Westbrook. The defendant RONALD DENT ("DENT") was Manhattan Vending's sales manager and had limited authority to hire and fire salespersons. The defendant DENT was also employed as a salesperson with Westbrook Marketing. The defendant DENT's responsibilities included training new salespersons, supervising salespersons and drafting Manhattan Vending's sales pitches.

5. The defendant AIMEE PEREIRA ("PEREIRA") was employed as a receptionist, office manager and customer service representative for Essex, Westbrook, Manhattan Vending and USA Vending. Initially, the defendant PEREIRA's responsibilities included answering telephone calls wherein PEREIRA took personal information from the callers and directed them to salespersons or to GUADAGNO. Over time, the defendant PEREIRA's responsibilities increased and included bookkeeping, ordering and tracking delivery of vending machines, responding to customer service calls and complaints and providing shipping and tracking information to customers.

6. The defendants THOMAS RE ("RE"), THOMAS LIGOR ("LIGOR"), CHARLES RIZZO, also known "Charlie Walker" ("RIZZO"), LEONARD GELLER ("GELLER"), WILLIAM HOBERG ("HOBERG"), RICHARD GUADAGNO, JR. ("GUADAGNO, JR."), HOWARD KELLY ("KELLY"), ANTHONY HALL ("HALL"), JOE MCDONALD ("MCDONALD") and MICHAEL BRETT ("BRETT") were employed as salespersons with MHV. These defendants routinely received and placed telephone calls and sent

and received material through the United States mail and through private or commercial interstate carriers in order to induce customers to purchase vending machines. After customers purchased multiple vending machines, the customers were referred to a locator service to obtain sites in which to place the vending machines that were purchased.

7. The defendant SETH LEHRENBAUM, also known as "Jim Peterson" and "Seth Peterman" ("LEHRENBAUM"), was an officer and a broker with Golden Key Locations, Inc. ("Golden Key") located at 4321 SW 109 Court, Miami, Florida which used a mail forwarding address at 7777 Bonhomme, Suite #1400, Saint Louis, Missouri. LEHRENBAUM charged customers who bought vending machines a fee to find locations in which to place those machines.

The Scheme To Defraud

8. It was a part of the scheme to defraud that the defendant GUADAGNO placed and caused to be placed intentionally misleading advertisements in newspapers throughout the United States that appeared to offer vending machines and established vending machine routes for sale. The advertisements were designed to induce customers to believe that the vending machine routes were already established, and further indicated that the routes would only be available for a limited time period, usually two weeks, thereby creating a false sense of urgency to complete the purchase. Customers responded to the advertisements

typically by calling a toll-free telephone number contained in the advertisements. The calls were received by receptionists or other employees who took initial information from the callers and then directed the calls to various MHV salespersons. The salespersons initially determined the financial qualifications of the callers. Thereafter, the salespersons recited to the callers information contained in sales scripts, commonly referred to as "pitch sheets."

9. It was a further part of the scheme to defraud that the pitch sheets contained generalized statements, false statements and unsubstantiated projections about the number of sales that could be made each day and the amount of profits that could be earned. The salespersons often convinced customers that the figures used in the projections were conservative and that the actual sales would be higher. Many of the salespersons falsely represented to customers that MHV had an exclusive distribution arrangement with Pringles or Proctor & Gamble, the manufacturers of Pringles chips. According to the sales pitch, the gross profit for each "vend" or individual sale of Pringles would be sixty to eighty cents.

10. It was a further part of the scheme to defraud that the salespersons steered customers to locator services that received fees from customers to place vending machines in profitable locations. The locator services were represented to

be reputable and successful companies with which MHV had successful working relationships.

11. It was a further part of the scheme to defraud that the defendant LEHRENBAUM received calls from MHV customers seeking information about vending machine placement throughout the United States. The defendant LEHRENBAUM charged a fee of approximately $200 per machine. The defendant LEHRENBAUM falsely represented to customers that MHV was a reputable business that was so big that it was able to get the exclusive rights to sell Pringles chips in its machines. It was also part of the scheme that the defendant LEHRENBAUM and MHV salespersons attempted to "cross-sell" their respective services.

12. It was also part of the scheme to defraud that the defendant LEHRENBAUM offered customers a "no loss of money guarantee" that represented that if customers placed machines through Golden Key, if at the end of one year the customer did not break even on the vending machine investment, Golden Key would (a) pay the customer the difference between the investment cost and the money earned; (b) take over ownership of the vending machines and routes; (c) pay the customer 7% over and above the customers' initial investment; and (d) pay the customer an additional 25% of the proceeds of the sale of the vending machines and routes if Golden Key was later able to sell them. A copy of the "no money loss guarantee" is attached hereto and

incorporated by reference as Exhibit A.

13. It was a further part of the scheme to defraud that the defendant LEHRENBAUM falsely represented to customers that Golden Key operated from a location at 7777 Bonhomme Suite 1400, St. Louis, Missouri when in fact, that location was simply a private mail forwarding and receiving company. The defendant LEHRENBAUM was physically located in and operated Golden Key from 4321 SW 109th Court, Miami, Florida. Although the defendant LEHRENBAUM and MHV salespersons represented to customers that Golden Key and MHV were independent of one another, the defendant LEHRENBAUM on occasion, received calls from MHV customers while working inside its offices. In reality, the defendant LEHRENBAUM spent time at MHV training its staff how to "cross-sell" Golden Key and MHV's services.

14. On or about April 8, 2002, Victim #1, an MHV customer who resides outside the Eastern District of New York and whose identity is known to me, responded to a newspaper advertisement in the Cedar Rapids Gazette that appeared to be for the purchase of an "ESTABLISHED 40 machine vending route. Big return! Big $$. Must Sell by 4/17." [1] The advertisement also listed a telephone number for MHV in Greenlawn, New York. Thereafter, Victim #1 spoke to the defendant RE on several occasions about purchasing vending machines and routes. The

---

[1] The identity of each of the Victims mentioned herein is known to Your Deponent.

defendant RE made numerous false representations to Victim #1 including, but not limited to, false representations that overstated profit projections. The defendant RE advised Victim #1 that: (a) he could earn a profit of over $230,000 annually on the purchase of 40 vending machines; (b) MHV had an exclusive agreement to sell Pringles chips in vending machines; (c) Victim #1 would be the only person within his immediate area with the Pringles chip vending machines; and (d) the vending machines would be delivered within thirty days of receipt of the purchase price of the machines. The defendant RE referred Victim #1 to the defendant LEHRENBAUM using LEHRENBAUM's alias "Jim Peterson" at Golden Key to discuss placement of the vending machines. Victim #1 called Golden Key and spoke to an unidentified representative.

15. The unidentified representative of Golden Key told Victim #1 that Golden Key was an independent company. The unidentified Golden Key representative also reinforced RE's false representations concerning profitability of the vending machines by quoting a national average of vends per day as being 15 to 20 vends per day for each machine.[2] The unidentified Golden Key representative also made a "no loss of money guarantee." Based on these and other representations, Victim #1 entered into contracts with MHV to purchase 40 Pringles vending machines.

---

[2] A vend is commonly recognized in the industry to be a sale of one unit of a product.

16. On or about and between April 15, 2002 and April 25, 2002, at the direction of the defendant RE and the defendant DENT, Victim #1 sent in excess of $55,000 by wire and cashiers check to MHV bank accounts held at Dime Savings Bank and Fleet Bank, both of which had branches located in Greenlawn, New York. Victim #1 also entered into a separate contract with Golden Key to place the vending machines and sent $4,000 to Golden Key for location services.

17. While awaiting delivery of the vending machines, Victim #1 began looking for locations in and around Cedar Rapids, Iowa in which to place the vending machines. According to Victim #1 he was surprised to find that there were already several Pringles vending machines in locations in and around Cedar Rapids. Victim #1 contacted MHV to question why there were other Pringles vending machines in the Cedar Rapids area and to question why the machines that he ordered were not delivered within the thirty days promised. Victim #1's calls were referred to various persons at MHV including the defendants DENT and PEREIRA.

18. To date, Victim #1 has never received any vending machines and his efforts to negotiate to receive a portion of the machines ordered or a refund were unsuccessful.

19. In or about July 2001, Victim # 2, an MHV customer who resides outside of the Eastern District of New York,

responded to a newspaper advertisement for vending machines. Victim # 2 spoke with the defendant LIGOR who told Victim #2 that each machine would generate a net profit of between $5,000 and $6,000. Victim # 2 was interested in purchasing 20 machines, and on or about August 1, 2001, Victim #2 went to MHV's offices at 12 Gates Street for a site visit. Victim #2 met the defendants GUADAGNO, LIGOR and PEREIRA. At that time, the defendant GUADAGNO, using the alias "Rich Dano," was introduced to Victim #2. The defendants GUADAGNO and LIGOR represented to Victim #2 that he would receive his machines within two to three weeks after paying for the machines. During the site visit, Victim #2 paid $47,500 by check to the defendant GUADAGNO for the purchase of 25 machines.

20. In approximately mid-September 2001, Victim #2 contacted the defendants GUADAGNO and LIGOR to arrange delivery of the machines. Victim #2 rented a storage facility to house the machines upon their delivery in reliance on the defendants GUADAGNO and LIGOR's representations that the machines were ready to be shipped out to Victim #2.

21. As of October of 2001, Victim #2 still had not received the machines. A review of the purchase and shipping records in this investigation reveals that the defendant GUADAGNO never paid the manufacturer for the vending machines.

22. Thereafter, on several occasions, the defendant

GUADAGNO falsely represented to Victim #2 that the machines had been shipped out to Victim #2. The defendant GUADAGNO also provided Victim #2 with shipping and tracking numbers that he claimed were for Victim #2's machines. Victim #2 called the freight company that was supposed to have shipped his machines and learned that the shipping company had no record of any machine to be shipped to Victim #2. Thereafter, the defendant GUADAGNO continued to falsely represent to Victim #2 that the machines were shipped.

23. After not having received the machines despite the continued false representations and promises by the defendant GUADAGNO, Victim #2 retained an attorney. In or about November 2001, the attorney contacted the defendant GUADAGNO. The defendant GUADAGNO provided additional tracking numbers to the attorney who later learned that they were in fact false numbers. Victim #2's attorney also subsequently learned that the manufacturer of the vending machines had never received payment from the defendant GUADAGNO for the machines that Victim #2 ordered.

24. On or about May 24, 2002, Victim #3, an MHV customer who resides outside of the Eastern District of New York, responded to a newspaper advertisement for vending machines. Victim #3 spoke with the defendant RIZZO, who was using the alias "Charlie Walker." The defendant RIZZO and other unidentified MHV

representatives falsely told Victim #3 that the Pringles vending machine program was a brand new program sponsored by Proctor & Gamble and given exclusively to MHV. Based on these and other false representations concerning profit projections that customers could make more than their initial investment after one year, Victim #3 purchased ten Pringles vending machines for $14,450. Victim #3 paid for the machines by personal check and wire transfer to a Fleet Bank account in Greenlawn, New York that was controlled by the defendant GUADAGNO.

25. In subsequent dealings with MHV representatives, Victim #3 spoke with the defendants GUADAGNO and PEREIRA. In or about June of 2002, the defendant PEREIRA falsely stated to Victim #3 that he was the "next one on the list" for delivery. Based on this and other false representations, Victim #3 paid $200 per machine to a locating service to find locations for placement of the machines. In or about June of 2002, after failing to receive the machines, Victim #3 contacted the defendant GUADAGNO. The defendant GUADAGNO falsely told Victim #3 that there were production delays at the manufacturer that temporarily prevented fulfillment of his vending machine order. Victim #3 eventually contacted the manufacturer's broker who reported that the defendant GUADAGNO had never sent the money to complete the manufacture and shipment of that order. To date, Victim #3 neither received the vending machines nor any refund.

26. In or about August of 2001, Victim #4, an MHV customer who resides outside of the Eastern District of New York, responded to a newspaper advertisement for vending machines. Victim #4 spoke with the defendant GELLER. The defendant GELLER worked at MHV for several months including the time period between April 2001 and October 2001.[3] The defendant GELLER falsely represented to Victim #4 that current customers who had purchased Pringles vending machines were earning $90,000 annually on 10 vending machines. The defendant GELLER also falsely represented to Victim #4 that the Victim #4 could make up to $300,000 annually on a purchase of 15 machines. GELLER falsely represented to Victim #4 that Victim #4 should purchase the vending machines immediately because there were a limited number available for the short duration of the Pringles machine promotion. A review of MHV's financial records revealed the existence of a W-4 form for the defendant GELLER that indicated the GELLER was hired to work at MHV on or about April 16, 2001.

27. Thereafter the defendant GELLER caused written information to be mailed to Victim #4 that projected profits exceeding $79,000 annually for 15 vending machines. Based on these and other false representations, Victim #4 took out a home equity line of credit to purchase 15 Pringles vending machines.

---

[3] An NCIC criminal history check reveals that the defendant GELLER has been arrested approximately 5 times between 1967 and 2001 for federal offenses including conspiracy to defraud the United States government, mail fraud, conspiracy to commit mail fraud and conspiracy to commit wire fraud.

Victim #4 sent $20,925 by wire transfer to a Dime Savings Bank account in Greenlawn, New York that was controlled by the defendant GUADAGNO.

28. In or around October of 2001 during subsequent dealings with MHV, Victim #4 spoke with the defendant GUADAGNO. The defendant GUADAGNO falsely represented to Victim #4 that the machines were en route. Thereafter, during subsequent conversations about the non-delivery of the machines, the defendant GUADAGNO falsely represented to Victim #4 that there had never been any problem with machine delivery at Westbrook Marketing. In or about November of 2001, the defendant GUADAGNO falsely represented to Victim #4 that funds for the manufacture of the machines had been released to the manufacturer. Victim #4 subsequently tried to confirm with the manufacturer that the machines would be delivered. A representative for the manufacturer advised Victim #4 that funds were never received for the machines. When Victim #4 confronted the defendant GUADAGNO about this information, GUADAGNO provided tracking numbers that Victim #4 later learned were false.

29. In or about April of 2002, Victim #4 contacted a radio consumer help show seeking assistance with the non-delivery problem. During a telephone conversation shortly thereafter, the defendant GUADAGNO told Victim #4, "Listen here, you little bitch. You better watch out. Don't push me. You don't know

what you're dealing with." Victim #4 eventually received vending machines more than six months after she ordered them. In subsequent interviews with law enforcement agents, Victim #4 said the vending machines failed altogether to reach projected earnings.

30. A review of the records for Victim #4's vending machines reveals that their gross sales amount was $719 for approximately 9 machines that were placed during the time period between approximately August of 2002 through December 31, 2002. In 2003, Victim #4's gross sales from approximately six machines were approximately $1,148. Victim #4 eventually sold 3 of the vending machines on the internet for a total of approximately $467.50.

31. In or about June 2001 Victim #5, an MHV customer who resides outside the Eastern District of New York, responded to a newspaper advertisement for vending machines. Victim #5 spoke to the defendant HOBERG. Victim #5 told the defendant HOBERG that she wanted to supplement her family income because of the impending retirement of her spouse. The defendant HOBERG falsely represented to Victim #5 that if she purchased approximately 40 vending machines she could expect to earn gross profits of $500 per day from them. The defendant HOBERG further urged Victim #5 to pay for the purchase of machines as soon as possible to insure their receipt before her husband's retirement.

The defendant HOBERG also falsely promised Victim #5 that if she acted immediately, her order would be processed more quickly and that she would be the exclusive owner of Pringles vending machines in the Denver area. The defendant HOBERG stressed the urgency of acting quickly in a mailing that was sent to Victim #5. That mailing included a letter signed by "Rich Dano" which recommended that the customer "call your representative *immediately* to make sure a desirable area is still available." That mailing also falsely projected a gross profit in excess of $230,000 for 44 vending machines.

32. On or about July 13, 2001, based on these and other false representations, Victim #5 entered into a contract to purchase 44 vending machines and wire transferred $49,000 to an MHV account held at Dime Savings Bank account located in Greenlawn, New York. The defendants HOBERG and GUADAGNO falsely represented to Victim #5 that the vending machines would be up and running by mid-August. Based on that and other misrepresentations, Victim #5 entered into a contract with a locator service to which Victim #5 paid a deposit of approximately $3,850. Victim #5 also purchased more than 800 cases of Pringles chips to stock the vending machines. However, as of September of 2001 Victim #5 had not received any vending machines.

33. On or about September 13, 2001, the defendant

PEREIRA provided false tracking numbers for the vending machine shipment to Victim #5. Thereafter, upon Victim #5's questioning the non-delivery of the vending machines, the defendant PEREIRA falsely represented to Victim #5 that there had been a mix-up of the payment for the vending machines due to the September 11 World Trade Center attacks. During subsequent conversations, the defendant GUADAGNO falsely represented to Victim #5 that payment for the machines was sent to MHV's broker on or about September 18th, and that Victim #5 should receive tracking numbers soon. However, the machines were not delivered by September 18, 2001, as the defendant GUADAGNO promised and, upon Victim #5's further questioning about the delivery date, the defendant GUADAGNO falsely represented to Victim #5 that the machines were to be shipped on October 5, 2001. During the time period between August of 2001 and January of 2002, Victim #5 did not receive delivery of any machines. Throughout this time period, the defendant GUADAGNO falsely represented to Victim #5 on several occasions that the broker was paid and that the machines would be shipped imminently.

34. Victim #5 eventually received the vending machines on or about January 21, 2002, more than six months after she purchased them. To date, the machines have failed dramatically to produce the amount of profit that was represented to Victim #5. In fact, the machines have failed to produce in an entire

year the amount of profit that the defendant HOBERG represented would be produced in one week.

35. In or about April of 2002, Victim #6, an MHV customer who resides outside of the Eastern District of New York, responded to an advertisement relating to an "absolute goldmine" or "bulletproof" vending machine route. Victim #6 spoke to the defendant GUADAGNO, JR. The defendant GUADAGNO, JR. falsely represented to Victim #6 that MHV had an exclusive distribution relationship with Pringles. GUADAGNO JR. also represented that Victim #6 would earn about $3,000 per month on the purchase of 5 vending machines and that Victim #6 would receive the vending machines about two weeks after payment for the machines was received.

36. Thereafter, the defendant GUADAGNO, JR. caused literature to be mailed to Victim #6 that falsely represented that Victim #6, as an owner and operator of vending machines, could earn approximately $70.58 which is more than 5 times the average hourly income of a factory worker ($12.35) and more than 3 times the hourly wage of a plumber ($22.00). The defendant GUADAGNO, JR., referred Victim #6 to the defendant LEHRENBAUM at Golden Key. The defendant LEHRENBAUM in turn, made additional false representations to Victim #6 including the "no loss of money guarantee" set forth in paragraph 12 above and that Victim #6 would recoup the initial investment within three to four

months.

37. Based on these and other false representations, on or about May 1, 2002, Victim #6 entered into a contract for the purchase of 5 Pringles vending machines at a cost of $7,475, which was wire transferred to MHV's Fleet bank account in Greenlawn, New York.

38. Because the vending machines were not delivered within two weeks of payment as promised, Victim #6 contacted the defendant GUADAGNO, JR. The defendant GUADAGNO, JR. provided a false tracking number to Victim #6. The machines still were not delivered the following month and thereafter, Victim #6's calls were no longer put through to GUADAGNO, JR. Victim #6 was provided another false tracking number by an unidentified receptionist at MHV and was told that shipment of the vending machines was imminent. In approximately August 2002, Victim #6 received the vending machines. The machines were placed through Golden Key but failed altogether to produce the projected income. At present, Victim #6 reports that she is "lucky" if the machines produce $50 in revenue per month.

39. In accordance with the continuous monthly income reporting requirement contained in the defendant LEHRENBAUM's "no loss of money guarantee," Victim #6 routinely mailed to Golden Key monthly reports of income generated by the vending machines. Victim #6 did not receive any confirmation or other response from

Golden Key and, eventually, the last report sent by Victim #6 was returned undelivered in February 2003. To date, Victim #6 has not received any response or compensation from the defendant LEHRENBAUM or Golden Key under the "no money loss guarantee" provision.

40. In or about March 2002, Victim #7, an MHV customer who resides outside of the Eastern District of New York, responded to an advertisement for a vending machine route. Victim #7 spoke to the defendant KELLY. KELLY falsely represented to Victim #7 that he could earn between $3,000 and $4,000 per Pringles machine. The defendant KELLY caused literature to be mailed to Victim #7 that falsely represented that the Victim #7, as an owner and operator of a vending machines, could earn approximately $70.58 which is more than 5 times the average hourly income of a factory worker ($12.35) and more than 3 times the average hourly income of a plumber ($22.00). On or about March 19, 2002, the defendant KELLY sent Victim #7 a fax requesting that Victim #7 contact the defendant LEHRENBAUM about locations for the vending machines. During conversation with Victim #7, the defendant LEHRENBAUM falsely represented that Victim #7 could earn between $4,000 and $5,000 profit per vending machine per year. The defendant LEHRENBAUM promised Victim #7 that if he did not recoup his investment within one year at the locations LEHRENBAUM secured for him,

Victim #7 would receive his money back plus an additional 7%. Based on these and other false representations, Victim #7 entered into a contract for the purchase of 12 Pringles vending machines at a cost of $14,450 which was wire transferred to an MHV account.

41. The machines were never delivered to Victim #7 and, after numerous conversations with the defendant GUADAGNO about the non-delivery, Victim #7 eventually drove 700 miles to pick them up himself. Once the machines were placed in the Golden Key locations, they failed altogether to produce the projected income. Victim #7 removed some of the machines after they generated as little as $1 to $3 per month. In fact, Victim #7's best performing machine produced only about $25 per month.

42. In or about April 2002, Victim #8, an MHV customer, who resides outside of the Eastern District of New York, responded to an advertisement relating to vending machine routes. Victim #8 spoke to the defendant HALL several times. The defendant HALL worked at MHV for several months including the time period between April 2002 and July 2002.[4] The defendant HALL falsely represented to Victim #8 that MHV represented Pringles exclusively. The defendant HALL also falsely represented to Victim #8 that he could expect the vending

4 An NCIC criminal history check reveals that the defendant HALL has been arrested approximately 39 times in 4 states and the District of Columbia on charges ranging from forgery, passing a false instrument and credit card forgery to assault and weapon possession charges.

machines to produce between 12 and 20 vends per machine per day. The defendant HALL also falsely represented to Victim #8 that he would recoup his investment on 15 vending machines within about 6 months. Specifically, the defendant HALL told Victim #8 that he could expect to earn approximately $60,500 annually. The defendant HALL caused literature concerning the Pringles machines to be mailed to Victim #8 and arranged a three-way telephone conference call with the defendant LEHRENBAUM, who reinforced HALL's profit projections. The defendant LEHRENBAUM in turn, represented that if the machines Victim #8 located with Golden Key did not meet their profit projections, he would purchase them back in one year. Based on these and other false representations, on or about May 26, 2002, Victim #8 entered into a contract for the purchase of 15 Pringles vending machines at a cost of $20,925. Victim #8 sent two checks totaling $11,000 by mail and wire transferred the remainder to an MHV account in Greenlawn, New York. Believing that the vending machines would be delivered to him by July 4, 2002, Victim #8 also entered into a contract with the defendant LEHRENBAUM to place the vending machines at a total cost of $3,000.

43. When the vending machines did not arrive by July 4, 2002 as represented, Victim #8 contacted the defendant HALL who falsely told Victim #8 that the factory producing the vending machines was backed up. During subsequent contact with

MHV representatives, Victim #8 learned that the defendant HALL no longer worked at the company. In or about early August of 2002, Victim #8 was put in contact with the defendant DENT who advised that the vending machines were to be shipped the following week. When the machines did not arrive, the defendant DENT falsely represented to Victim #8 that the factory was having difficulty fulfilling the order. To date, Victim #8 has not received the vending machines nor has he received any refund.

44. In or about May of 2002, Victim #9, an MHV customer who resides outside of the Eastern District of New York, responded to a newspaper advertisement in a Denver, Colorado newspaper regarding vending machines. Victim #9 spoke with the defendant MCDONALD. The defendant MCDONALD falsely represented to Victim #9 that he would earn a yearly gross profit of $169,000 on a purchase of approximately 44 vending machines. The defendant MCDONALD referred Victim #9 to the defendant LEHRENBAUM who reinforced MHV's legitimacy and caused literature to be sent to Victim #9, including literature that contained the "no money loss guarantee." Thereafter, the defendant GUADAGNO took over vending machine purchase negotiations with Victim #9. Based on false representations made by the defendants GUADAGNO, MCDONALD and LEHRENBAUM, Victim #9 purchased 44 vending machines at a total cost of $50,000, which Victim #9 wire transferred to an MHV account. Victim #9 also entered into a contract with Golden Key

at a cost of approximately $8,800 to place the vending machines purchased from Manhattan Vending.

45. In or about June of 2002, based on previous false representations that the vending machines would be shipped within 30 to 60 days of payment of the purchase price, Victim #9 bought a truck and tools to service the machines, rented a warehouse and took other steps to set up operation. During that time period, Victim #9 began to hear negative information about MHV and confronted the defendant GUADAGNO. The defendant GUADAGNO dismissed the issues that Victim #9 raised and assured him that MHV was legitimate. Thereafter, when the machines were not delivered as promised, the defendant GUADAGNO continued to falsely represent to Victim #9 that the vending machines were ready to ship and that there was a backlog of purchase requests.

46. On or about July 10, 2002, as a result of the non-delivery of the vending machines, Victim #9, in an effort to recoup their purchase price, entered into a verbal agreement with the defendant GUADAGNO that MHV would sell the 44 machines he had already paid for and return the money to Victim #9. The defendant GUADAGNO later told Victim #9 that a check payable to MHV for the purchase of 10 of those 44 machines had bounced and that he was going to obtain a loan to resolve the debt owed to Victim #9. To date, Victim #9 received neither the promised refund nor vending machines.

47. In or about May of 2002, Victim #10, a customer of MHV who resides outside the Eastern District of New York, responded to an advertisement in a newspaper. Victim #10 spoke to the defendant BRETT who falsely represented to him that MHV had an exclusive arrangement with Proctor & Gamble to use the Pringles logo and distribute Pringles chips. The defendant BRETT also falsely represented to Victim #10 that he would clear a profit of $30,000 per year on a purchase of 5 vending machines. The defendant BRETT referred Victim #10 to the defendant LEHRENBAUM who confirmed that MHV was a legitimate company. As a result of the false representations of the defendants BRETT and LEHRENBAUM, Victim #10 sent checks in the total amount of $7,475 to MHV. The defendant BRETT told Victim #10 that he would receive the machines within 90 days. The machines were not delivered within the 90 day period. As of September 2002, Victim #10 had not received any vending machines and began to call MHV's offices. Thereafter, Victim #10 spoke on numerous occasions to the defendant GUADAGNO who repeatedly falsely represented to Victim #10 that the machines were en route. The defendant GUADAGNO also provided Victim #10 with fictitious tracking numbers. To date, Victim #10 has not received any machines.

48. During the course of the investigation interviews were conducted with several former MHV employees including some of the defendants named herein. On or about April 24, 2004, I

and another FBI special agent interviewed the defendant PEREIRA. During the course of the interview, the defendant PEREIRA stated, in sum and substance and among other things, that: a) she was hired by the defendants GUADAGNO and SILVER and had worked for the defendant GUADAGNO from approximately 1998 through 2002; b) a major problem with MHV was that the machines were not being shipped; c) the defendant GUADAGNO was stealing the money and the sales staff joked about GUADAGNO stuffing money into his mattress; d) one of the locator companies that the defendant GUADAGNO used was in Florida and was in collusion with GUADAGNO; e) employees at MHV used aliases; f) sales people told customers how much profit they would make; g) after the FTC searched MHV's offices, the defendant GUADAGNO told sales staff not to make promises over the phone because he thought the FTC was recording calls; and e) the sales staff became afraid that they would be implicated in the fraud when customers started to call and complain about non-delivery of vending machines.

49. In or about January and February 2004 Postal Inspector Woodward and I interviewed the defendant BRETT on two occasions. During the course of the interviews BRETT stated, in sum and substance and among other things, that: a) he and other salespersons were aware that the profit projections that they represented to customers would not be attainable; b) several customers did not receive the machines for which they paid; c)

during the time that BRETT was selling the vending machines, the defendant DENT told BRETT that MHV did not have a relationship with Proctor & Gamble; and e) the defendant DENT developed the misleading price sheets and pitch sheets that MHV salespersons used.

50. On or about October 15, 2003 and July 22, 2004, Postal Inspector Woodward and I interviewed the defendant KELLY. During the course of the interview, the defendant KELLY stated, in sum and substance and among other things, that: a) by the time the FTC raided MHV's offices it was generally known by the sales staff that some of the vending machines were not being shipped to customers; b) the defendants GUADAGNO and RE devised a ploy whereby they made customers believe that RE had a computer at his desk that could provide a listing of available locations for the customer; c) that within four or five months of working at MHV any reasonable person would realize that the business was not legitimate; d) the defendant KELLY knew that the locations that the defendant LEHRENBAUM offered to customers were not high-volume locations and were not likely to provide the amount of vends that were represented in the sales pitch sheets; and e) after the FTC raided MHV's offices, the defendant GUADAGNO instructed staff that they were not to disclose his continued presence at and affiliation with MHV.

51. On or about July 31, 2003, Postal Inspector

Woodward and another law enforcement agent interviewed the defendant DENT. During the course of the interview the defendant DENT stated, in substance and among other things that: a) the defendant LEHRENBAUM was a crook and the "worst of the worst;" b) he learned that the defendant PEREIRA was knowingly lying to customers about vending machine being shipped out; c) the defendant SILVER acted as a front for one of the MHV entities; and d) with respect to the defendant LIGOR, "Name the lie and he told it" and that LIGOR told DENT, in sum and substance that if you want to make money you have to lie to them.

52. On or about September 17, 2003, Postal Inspector Woodward and I interviewed a confidential source ("CS-1") who is a former employee of MHV who stated, in sum and substance and among other things, that: a) the defendant GUADAGNO instructed office staff to be provide false tracking numbers to customers; b) the defendant GUADAGNO fabricated excuses when customers called to inquire about the non-delivery of vending machines; c) several of the salespersons, including the defendants RIZZO, McDONALD, BRETT, RE, GUADAGNO, JR. and HALL, knew that the vending machines were not being delivered to customers, but continued to sell even though they knew of the non-delivery problem; d) CS-1 heard the defendant GUADAGNO brag about having beaten an unidentified man outside a restaurant because GUADAGNO thought that the man had been disrespectful to his mother; e) CS-

1 heard the defendant GUADAGNO threaten to kill the defendant LEHRENBAUM; and f) the defendant GUADAGNO told CS-1 that he sent some unidentified persons to Florida to beat the defendant LEHRENBAUM.

53. On or about October 3, 2003 and August 4, 2004, Postal Inspector Woodward and I interviewed the defendant SILVER. During the course of the interview the defendant SILVER stated, in sum and substance and among other things, that: a) he was associated with the defendant GUADAGNO and worked at Castle; b) he knew that there was a problem with non-delivery of vending machines to customers while he was with Castle and while the defendant GUADAGNO controlled the successor businesses; c) the defendant GUADAGNO pocketed money from the business but failed to pay for vending machines and advertising; d) at various times he and other persons acted as a "front" for the defendant GUADAGNO while GUADAGNO ran MHV; and e) he continued to work with the defendant GUADAGNO knowing of the non-delivery problem in an effort to recover money and assets that he believed were owed to him and a share of future profits that GUADAGNO promised him.

54. During the course of the investigation interviews were conducted with a confidential source who is also a former employee of MHV ("CS-2") and a confidential source who invested money in MHV ("CS-3"). According to CS-2, on one occasion CS-2 saw the defendant GUADAGNO take a gun from a desk drawer and

chase John Doe, a former salesperson at MHV, out of the office.

55. According to CS-3, the GUADAGNO bragged about having gun and how many legs he had broken when he was younger. GUADAGNO also suggested to CS-3 that he had even killed people. According to CS-3, on one occasions when the CS questioned the defendant GUADAGNO about the diversion of money from MHV's accounts, GUADAGNO threatened CS-3 stating, "I'll f-king kill you." CS-3 further stated that he heard the defendant GUADAGNO threaten to kill an irate customer who had not received vending machines by stating "you come here and I'll show who will do what to who. You'll never get out of here. You'll never get home again." CS-3 also stated that CS-3 heard the defendant GUADAGNO threaten to kill a former MHV salesperson whom GUADAGNO believed to be diverting business from MHV to himself, stating "I'll f-king kill you. I'll blow your brains out."

56. I have also reviewed MHV's gross receipts and other financial records for the time period between approximately January 2000 and December 2002 which reveals that MHV received in excess $6 million dollars from vending machine sales. Due to the nature of the allegations herein, the sources of the information contained herein and the threats and violent behavior attributed to the defendant GUADAGNO, we respectfully request that this affidavit be filed under seal until the further order of the court.

WHEREFORE, it is respectfully requested that arrest warrants be issued so that the defendants RICHARD GUADAGNO, also known as "Rich Dano" and "Rich D'Amato," SIDNEY SILVER, RONALD DENT, AIMEE PEREIRA, THOMAS RE, THOMAS LIGOR, CHARLES RIZZO, also known as "Charlie Walker," LEONARD GELLER, WILLIAM HOBERG, RICHARD GUADAGNO, JR., HOWARD KELLY, ANTHONY HALL, JOSEPH MCDONALD, MICHAEL BRETT and SETH LEHRENBAUM, also known as "Jim Peterson" and "Seth Peterman," may be dealt with according to law.

SA Gavin B. Shea FBI NY
Gavin Shea, S/A
FBI

Sworn to before me this
13th day of August, 2004

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

EXHIBIT A

**Because "Golden Key Locations Inc." has the confidence of your success is why we give you:**

# (A NO LOSS OF MONEY GUARANTEE)

**If for any reason, with the exception of not taking proper care of your equipment, or acts of god, Golden Key Locations Inc. will not only give you the difference of your investment, but also a profit. Example, at the end of your full fiscal year your records show that on your 10,000 dollar investment your income was only 9,000, Golden Key Locations Inc. will then not only give you the loss of dollars you were short to break even, but also give you a profit of 7%. All that is required is you send us a monthly report of what your equipment is producing. At the end of your fiscal year if you so desire to enforce this guarantee. Golden Key Locations Inc. has the right to become the sole owner of your route , in which they will proceed to sell the route for a profit. At the time of the sale you will receive an additional 25% of the selling price of this route.**

1198.25

**Golden Key Locations Inc.** **Date:**

**Distributor** **Date:**